Filed 10/27/16

# CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F069936 |
| Plaintiff and Respondent, | (Super. Ct. No. SC064734A) |
| v. | |
| VICTOR LEON BUFORD, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County. Michael G. Bush, Judge.

Heather J. MacKay, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, Plaintiff and Respondent.

-ooOoo-

---

\*     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part I of the Discussion, the Disposition, and the Concurring Opinion are certified for publication.

**SEE CONCURRING OPINION**

## INTRODUCTION

Victor Leon Buford (defendant), an inmate serving a term of 25 years to life in prison following conviction of a felony that was not violent (as defined by Pen. Code, § 667.5, subd. (c)) or serious (as defined by Pen. Code, § 1192.7, subd. (c)), filed a petition pursuant to the Three Strikes Reform Act of 2012 (hereafter Proposition 36 or the Act) to have his sentence recalled and to be resentenced.[1] (§ 1170.126, subd. (b).) Following a hearing, the trial court concluded resentencing would pose an unreasonable risk of danger to public safety and denied the petition.

In the published portion of this opinion, we hold the People have the burden of proving, by a preponderance of the evidence, facts on which a finding that resentencing a petitioner would pose an unreasonable risk of danger to public safety reasonably can be based. Those facts are reviewed for substantial evidence. We further hold, the preponderance of the evidence standard does not apply to the trial court's determination regarding dangerousness, nor does section 1170.126, subdivision (f), create a presumption in favor of resentencing. The ultimate decision — whether resentencing an inmate would pose an unreasonable risk of danger to public safety — instead lies within the sound discretion of the trial court. We also hold section 1170.18, subdivision (c) does not modify section 1170.126, subdivision (f). As we explain in the unpublished portion of our opinion, we find no abuse of discretion and affirm.

## FACTS AND PROCEDURAL HISTORY[*]

At approximately 3:30 a.m. on October 15, 1995, Kern County Sheriff's Deputy Hakker observed a gold-colored Dodge, driven by defendant, traveling with the passenger door fully open.[2] A woman in the passenger seat was screaming to be let out.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[*] See footnote, *ante*, page 1.

Hakker immediately initiated a pursuit of the vehicle.[3] During the pursuit, defendant drove through a number of posted stop signs and red lights, and reached speeds in excess of 65 miles per hour. At one point, with the vehicle smoking profusely, defendant drove onto a dirt easement adjoining railroad tracks and used the railroad bridge to cross a canal. Upon his return to surface streets, he traveled erratically at speeds ranging from 40 to 70 miles per hour and continued to run through red lights and posted stop signs at intersections. Eventually, he ended up traveling against traffic at 55 miles per hour, forcing other vehicles on the road to take evasive action to avoid collision.

The Dodge pulled off the road and continued through a vacant field, where it collided with a power pole guide wire. Defendant fled on foot. When apprehended, he continued to resist even after pepper spray and a baton were used in an attempt to subdue him. It took several officers to finally get him handcuffed and into custody. Defendant, whose speech was slurred and who had a " 'wild look' " on his face and smelled strongly of alcohol, gave several false names when asked to identify himself and refused to submit to a chemical test to determine if he was under the influence.

Defendant was charged with numerous offenses arising out of the incident. At trial, he testified he had consumed 24 cans of beer and two pints of whiskey over the 12-hour period prior to the car chase. He failed to comply with the patrol car's signal lights because he usually was beaten and hassled by the police. He denied going through stop signs and red lights, and insisted he carefully looked before crossing intersections. He admitted that at some point, one of the Dodge's tires suffered a blow out and shredded to

---

**2**     The facts of defendant's commitment offense are derived from our nonpublished opinion in *People v. Buford* (Jan. 15, 1997, F025449), of which we have taken judicial notice by separate order.

**3**     As Hakker turned the corner, he saw the woman standing on the sidewalk, looking frightened but unharmed.

the rim, but he continued to drive on the rim because he was looking for a public area where he would feel safe to pull over.

On December 28, 1995, defendant was convicted of felony evasion of a police vehicle while driving with willful and wanton disregard for safety (Veh. Code, § 2800.2), as well as the following misdemeanors:  resisting a police officer (§ 148), driving under the influence (Veh. Code, § 23152, subd. (a); DUI), giving false identification to a police officer (§ 148.9, subd. (a)), and driving without a license (Veh. Code, § 12500, subd. (a)).  The jury further found he had suffered four prior strike convictions and had served five prior prison terms (§ 667.5, subd. (b)).  On January 26, 1996, he was sentenced to 25 years to life in prison on the felony offense, with five consecutive one-year terms for the section 667.5, subdivision (b) enhancements and concurrent jail terms for the misdemeanor convictions.

On December 7, 2012, defendant filed a petition under section 1170.126 asserting he was statutorily eligible for resentencing under the Act.  The probation officer recommended defendant be resentenced to the upper term of six years on his current felony, plus five years for the section 667.5, subdivision (b) enhancements, for a total fixed term of 11 years; and that defendant's sentence be deemed served and he be released on parole.  The People opposed the petition, arguing that releasing defendant would result in an unreasonable risk of danger to public safety.  They pointed to defendant's lengthy criminal record, which included 17 convictions (including three robbery strike priors and a residential burglary strike prior) since 1975, as well as the continuance of his criminal behavior while in prison, his failure to address his substance abuse problem, and his lack of parole plans.[4]

---

[4]    Although the People appear to have mistaken defendant's first strike adjudication for his second strike conviction, they presented documentation showing one of defendant's strikes arose out of two incidents in November 1975, in which defendant, who had a gun in his waistband, grabbed the purses of two women in two different Laundromats.  Another arose from defendant burglarizing a residence in October 1978.

4.

The petition was heard on June 9, 2014.[5] Defendant, who testified at the hearing, was about to turn 57 years old and had spent 18 years in prison on his current commitment.

Defendant testified that he started drinking when he was around 15 or 16 years old, and drank heavily "[p]retty much from the beginning." His family was somewhat dysfunctional; his father was frequently drunk, verbally abusive toward defendant and his

Still another resulted from an incident in March 1991, in which defendant put the barrel of a gun under the victim's chin, took the victim's car keys, struck the victim in the head with the gun, and then told the victim to run. As the victim fled, he heard a couple of shots pass over his head.

The People also presented multiple prison rules violations reports. On July 22, 2003, there was a riot between White inmates and the Mexican nationals. Defendant received a shoulder injury. He was found guilty of participation in a riot with use of force. On September 30, 2005, defendant punched another inmate in the face. Defendant said he did so because he had been disrespected. Defendant pled guilty to battery on an inmate without serious injury. On June 25, 2006, five gallons of inmate-manufactured alcohol were found in defendant's cell. Defendant was found guilty of possession of inmate-manufactured alcohol. On July 28, 2007, defendant told an officer that he was in debt to certain inmates for his use of tobacco and heroin. Defendant refused to provide a urine sample and was found guilty of using a controlled substance and of refusing a urine test. On April 29, 2010, officers had to use pepper spray to stop defendant and another inmate from fighting. Defendant pled guilty to fighting requiring the use of force. On December 27, 2010, a syringe/inmate-manufactured "hype kit" was found in a box of defendant's letters. Defendant was found guilty of possession of drug paraphernalia. On March 16, 2011, officers had to use pepper spray to stop defendant and another inmate from fighting. Defendant pled guilty to fighting resulting in the use of force. On March 23, 2011, defendant refused to rehouse with another inmate. He pled guilty to refusing a bed move. On July 5, 2011, defendant refused to move and house with another inmate, and was found guilty of willfully delaying a peace officer in the performance of duty.

The People also presented documentation concerning other disciplinary violations incurred by defendant, his classification level, his time spent in administrative segregation for presenting a danger to himself or others and/or endangering institutional security, and his request to be placed in administrative segregation because he owed inmate groups for heroin, methamphetamine, and tobacco.

[5]     Because the judge who imposed defendant's third strike term was no longer on the bench, the matter was heard by a different judge. (See § 1170.126, subd. (j).)

brothers, and physically abusive toward their mother. Defendant dropped out of high school when he was 16, then worked in the oil fields and then for his father's tree service. He associated with the wrong crowd, drank "[e]very chance [he] got," and also used marijuana and speed.

Defendant got in trouble for robbery in 1976, when he was 17. He explained that he and a few other males were partying — driving around drinking and smoking marijuana — with an older woman. When they needed more money with which to party, defendant and another male went into a Laundromat at the behest of the woman and took some purses that were on the counter. There were two people present. A gun was in defendant's pants when he and his cohort entered. Defendant "guess[ed]" he brought the gun for "security reasons." He intended to make the other people afraid of him, but now thought of himself as a coward. As a result of the offense, defendant was committed to the California Youth Authority for a year. He was sent to a fire camp, and completed his term without problems. He was out about 30 days when he got in trouble for drunk driving.

In 1978 or 1979 came defendant's residential burglary conviction. Defendant explained that he and two other men went to the home of one's ex-girlfriend. When she was not there, the men went in and started partying — drinking and smoking marijuana — in the house. They ultimately took some things. As a result, defendant was sentenced to adult prison for the first time. He was paroled from prison in 1980, but got in trouble in 1981 for another drunk driving violation. He knew it was dangerous to human life, but at the time, he did not look at the consequences of anything he did. A lot of the times when he and his companions went out drinking, they would go out in the country and just drive around.

Defendant again went to prison in 1982. Although his record showed a robbery conviction and a conviction for some sort of forgery or passing a bad check, defendant did not remember any robbery at that time, but he did go into a market and try to pass a

6.

bad check.  He was sentenced to prison for three years, but released on parole in 1984.  A few months later, he was accused of grand theft of a firearm.  Guns were found under a house or in the back yard, and defendant was in the area at the time.  His aunt had given him the guns, but she said someone broke into her house and took them.  Defendant was sentenced to five years in prison.  Although he was released on parole in 1987, he was returned to prison for parole violations in 1988, 1989, and 1990.  He believed the violations consisted of not meeting with his parole officer and testing.

In 1989, defendant was arrested and convicted of resisting arrest.  He explained he wrecked his brother's car, suffered head trauma, and tried to run away from the officer at the hospital.

In 1990, defendant was convicted of being under the influence of drugs and possessing drug paraphernalia.  He was using methamphetamine at that time, simply because it was available.  He was working for his father's tree service.  Sometimes the job kept him busy, but not always.  He denied using drugs when he was bored; rather, he explained, sometimes they were available and sometimes not.  He used them when he could get them from his uncle.  Defendant related he had five other family members who had been to prison, of whom two were still alive.  Both of his brothers had been to prison for drug offenses, but they had been clean for four or five years as of the time of the hearing.

Defendant was released from prison in January 1991.  A couple months later, he picked up another robbery conviction.[6]  He and some others were at a hot springs where people went skinny dipping.  They were drinking and swimming and "messing around"

---

[6]    Defendant conceded that between 1975 and 1991, there were "probably" some crimes he committed for which he was not convicted.  Certain people on his father's side of the family sold drugs and gave loans, and defendant repossessed cars and picked up property for money owed.  He committed these kinds of theft crimes so he could party more.

when they saw somebody watching. One of the females in defendant's group had a small two-shot Derringer pistol in her bag, and they pointed the gun at the man and told him what he did was not okay. They took his car keys and threw them, and the man's Maglite flashlight ended up in the back of their truck. Although defendant admitted, at the hearing on his petition, having the gun in his hand, he denied pointing it at the victim or putting it under the man's chin. Defendant believed the gun was loaded at the time. He denied hitting the victim in the head with it, although he admitted firing a few shots over the man's head. He did that to get the man to run. Defendant wanted to make a point about the man peeping at the girls when they were in the hot tubs.

Defendant was sentenced to prison for eight years, but paroled in 1995. That year, he was convicted in his current case. He explained that he was out one night, drinking a bit. When the female in his car started screaming and kicking him, he stopped the car and told her to get out. He drove away, however, when the officer tried to stop him. He did not really accelerate away, although he admitted running numerous stop signs and going through a yellow light. He was traveling 55 to 65 miles per hour. The car jumped the curb when a tire blew out, causing him to drive into opposite lanes of traffic. Defendant fled when the officer tried to stop him, because he did not want to go to jail. People were getting three strikes for minor offenses. Defendant did not know if he would get a third strike sentence for driving under the influence. He had had a couple of six packs and a small bottle of wine. He was driving because his girlfriend's mother had been yelling, and he left the house to get some air. He admitted he would have been smarter simply to walk down the street. He also admitted refusing to take a blood or breath test.

When defendant was sentenced to an indeterminate life term in 1995 for the evasion case, he was disillusioned, afraid, and angry at himself. He used alcohol and controlled substances at times in prison. One of the events that triggered his use was the death of his brother, who died several years after defendant began serving his sentence.

He stopped because "[t]here was no use in it." As of the date he testified, defendant had been clean for 44 months. He had been attending informal meetings on the yard through a church, as there was a long waiting list to get into the formal NA and AA programs. He had been attending the informal meetings for about a year "[t]his time."[7] Because he was attending voluntarily, it gave him a sense of accomplishment that he was doing something for himself. There was also a sense of camaraderie with other people who were basically like him.

The last time defendant used alcohol or a controlled substance in prison was just before he went "to the hole" in 2010. He wanted to go to the hole to get off the yard, and used drugs as a means to get there without having to use violence. Defendant explained that "[o]n regular mainline" in prison, people were judged by their race all the time. He was not on the mainline as, in 2010, he went to the special needs yard (SNY) for refusing to submit to "gang rule." A younger generation of gang members had come into power and started running the yards. They decreed that someone could not be "a loner" anymore, but rather had to be in the gang or out of the gang. Defendant chose to be out. This made him a target. Young men wanting to get into the gang had come over and fought him, which resulted in him receiving several disciplinary violations even though he was defending himself.

Defendant was written up on March 16, 2011, "for fighting requiring use of force." That incident occurred when he was in administrative segregation. Defendant refused a cellmate, because guards were trying to put gang members "in the cages" so the guards could watch fights for their amusement.

Defendant was written up in 2005 for battery on an inmate, allegedly because the inmate disrespected him. Defendant explained the inmate touched him inappropriately

---

**7** The People presented documentation that defendant was an active member of the Narcotics Anonymous program for the quarter ending December 19, 1999, while housed at Folsom State Prison.

while they were in the shower, naked. Defendant told him not to be doing that, but when they left the shower area, the inmate said something and did it again, and defendant hit him.

Defendant was written up in 2003 for participation in a riot. He explained that the riot was between the Skinheads and the Mexican nationals, who were backed by the southern Hispanics. Defendant was sitting at a table on the yard, playing cards, when there was a ruckus. He stood up to see what was going on. The next thing he knew, he was stabbed in the shoulder. There ended up being 200 inmates fist-fighting, but being stabbed was defendant's only part in the events. After the guards gained control and got everybody down, they checked everyone. Because defendant had a shoulder injury, he was deemed to have been involved.[8]

Defendant had held various jobs while in prison. He liked working, as it passed the time. It was like fire camp, where the less time he had on his hands, the less he was going to get in trouble. If he was released from prison, he would have time and freedom on his hands. He had learned, however, that actions have consequences, and that a person was responsible for his or her actions. The last thing he wanted to do was to go back to prison. Right Way Pumping had offered him a job as a driver and "pumping hand" if he was released, although to be a driver, he would need a driver's license.[9] In addition, two programs were willing to accept him. One was a six-month, 12-step program at the Bible Tabernacle in Santa Clarita. After the six months, he would be offered the chance to work at a job-paying part of the program. The program would take one third of his money, allow him to keep one third, and put one third in the bank. It

---

[8] The probation officer's report written in conjunction with defendant's current commitment related defendant had numerous tattoos, including swastikas in two places, " 'White' " on his upper left arm, and " 'Pride' " on his upper right arm. The record contains no information concerning when or under what circumstances defendant obtained the tattoos.

[9] Defendant's driving privilege was apparently revoked.

could last as long as he was willing to stay. The other was a four-step program at the Mission that assisted with job applications, job placement, sponsor help, and the like. The residential program was for homeless only and was full, but the four-step program would require defendant to check in and test four times a week. If released, defendant's preference would be to go to the Bible Tabernacle program because of the length of the program, and the fact those involved worked specifically with people coming out of prison.

Defendant was willing to submit voluntarily to postrelease community supervision. He felt it would give him a sense of structure and someone responsible to talk to. As for living arrangements, defendant believed he had enough money to get a small apartment. In addition, a niece who lived in Oildale had said he could stay with her. Defendant would have no problem being subject to a search condition, submitting to drug and alcohol tests, or being ordered to go to treatment and to NA and AA meetings. He did not think it would be too much of a problem to stay away from alcohol; he got migraines that he attributed to drinking alcohol and "pruno," and did not feel he needed alcohol anymore. When he was younger, he was trying to forget things. Now he "need[ed] to live things." Defendant professed not to be the same man as when he was "a reckless user" and when he went to prison.

Defendant admitted his current commitment was his fifth prison commitment. At the time of his sentencing, he told the probation officer that, as far as drug use was concerned, he tried a little bit of everything and considered himself to be a drug addict. He also told the probation officer that he drank three to four quarts of beer and a bottle of wine or whiskey daily, if it was available. At the time, defendant did not realize he had a problem with alcohol, which he made and continued to drink in prison.[10] He realized he had a serious problem with alcohol about three years before the hearing. He had no

---

**10** Defendant testified he only had alcohol three times in prison.

11.

explanation for why it took so long, even though he could now see that alcohol was probably one of the driving factors behind his crimes.

Defendant acknowledged some inmates were in prison as long as him without incurring any disciplinary write-ups. Asked the difference between them and him, he responded, "They didn't get caught." He also acknowledged he had spent most of his sentence in Level 3 closed custody due to the length of his sentence. A year and a half before the hearing, he was permitted to go to the dormitories. He had been involved in an AA and narcotics program when he was in "Old Folsom," and participated for six or seven months. Then the riot happened and he was transferred to different prisons four or five times. Each had a two-year waiting list for their programs. About a year before the hearing, the parole board changed things so that it was no longer mandatory to take NA or AA to get parole, but inmates could instead participate in voluntary programs on the yards.

While he was in prison on his current commitment, defendant took a vocational janitorial class. At the time of the hearing, he was taking a GED course. He did not take it years ago because it was not a requirement and getting in was difficult. Now, inmates below a certain grade level had to take a GED test or go back to school. Defendant was not yet close to getting his GED, as he was not good in math. Being in Level 3 closed custody meant a lot of classes and jobs were not available to him.

At the conclusion of the hearing, the court took the matter under submission and allowed defendant to submit a further response to the People's opposition, along with documentation.[11] In his response, defendant argued there was no evidence he posed a

---

[11]     In part, defendant submitted postconviction progress reports, laudatory reports concerning his work assignments and vocational education, and education progress reports and certificates of completion for numerous vocational education units, including the Vocational Janitorial Services One Program. Defendant also presented a certificate of completion of the " '40 Days of Purpose' " program, a certificate of appreciation for

12.

current unreasonable risk to public safety. He noted his strike offenses were remote in time, contended his disciplinary record was for offenses not considered serious under the governing regulations, and observed he had not had a violent incident in more than three years and had not had an incident involving drugs or alcohol in three and a half years. Defendant also chronicled his work, vocational, and educational activities, along with his self-help endeavors, other evidence of rehabilitation, and re-entry plans.

On August 8, 2014, the court issued a written ruling denying the petition. In pertinent part, the court stated:

> "[Defendant] is entitled to resentencing unless the People prove by a preponderance of the evidence that [defendant] 'would pose an unreasonable risk of danger to the public safety.' The court has considered the petition, opposition and reply, along with the attachments and exhibits, filed with the court in addition to the testimony presented.
>
> "The court finds that the People have met their burden that [defendant] would pose an unreasonable risk of danger to the public safety. The court has considered all aspects of the information and evidence presented. The court notes [defendant]'s committing offense was for evading a police officer and for DUI. DUI is one of the most dangerous crimes the court sees on a regular basis. Despite having two priors for DUI, albeit . . . they are very old, and being sentenced to 25 years to life for an act during which he was DUI, [defendant] continued to use alcohol in custody. This court has a grave concern that if released [defendant] will consume alcohol and drive again, thereby putting the public safety at significant, unreasonable risk."

## DISCUSSION

### I

### The Applicable Legal Principles

In order to be eligible for resentencing as a second strike offender under the Act, the inmate petitioner must satisfy the three criteria set out in subdivision (e) of section

---

participating in a Victim's Awareness Workshop, and letters from RiteWay Pumping, the Bible Tabernacle, and the Mission at Kern County.

13.

1170.126.**12** (*People v. Superior Court (Martinez)* (2014) 225 Cal.App.4th 979, 988-989.) If the inmate satisfies all three criteria, as did defendant, he or she "shall be resentenced [as a second strike offender] unless the court, in its discretion, determines that resentencing the [inmate] would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) In exercising this discretion, "the court may consider: [¶] (1) The [inmate]'s criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The [inmate]'s disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (*Id.*, subd. (g).)

A. *A trial court's ultimate determination regarding dangerousness lies within its discretion; its ruling, therefore, is reviewed for abuse of discretion.*

The plain language of subdivisions (f) and (g) of section 1170.126 calls for an exercise of the sentencing court's discretion. " 'Discretion is the power to make the decision, one way or the other.' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the

---

**12** "An inmate is eligible for resentencing if: [¶] (1) The inmate is serving an indeterminate term of life imprisonment imposed pursuant to paragraph (2) of subdivision (e) of Section 667 or subdivision (c) of Section 1170.12 for a conviction of a felony or felonies that are not defined as serious and/or violent felonies by subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7. [¶] (2) The inmate's current sentence was not imposed for any of the offenses appearing in clauses (i) to (iii), inclusive, of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or clauses (i) to (iii), inclusive, of subparagraph (C) of paragraph (2) of subdivision (c) of Section 1170.12. [¶] (3) The inmate has no prior convictions for any of the offenses appearing in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or clause (iv) of subparagraph (C) of paragraph (2) of subdivision (c) of Section 1170.12." (§ 1170.126, subd. (e).)

14.

court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse-of-discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

Under the clear language of section 1170.126, the ultimate determination that resentencing would pose an unreasonable risk of danger is a discretionary one. We, therefore, review that determination for abuse of discretion. Of course, if there is no evidence in the record to support the decision, the decision constitutes an abuse of discretion. (See *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.)

B.     *The burden of proof of preponderance of the evidence applies to proof of the facts, not to the trial court's ultimate determination.*

Defendant asserts he cannot be denied resentencing unless the People proved dangerousness beyond a reasonable doubt. Alternatively, he says, the People must at least have proven the ultimate conclusion of dangerousness by a preponderance of the evidence. Although we agree preponderance of the evidence is the appropriate standard, we disagree with defendant on its application to the ultimate determination.[13]

> "The standard of proof, the United States Supreme Court has said, 'serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.' [Citation.] At one end of the spectrum is the 'preponderance of the evidence' standard, which apportions the risk of error among litigants in roughly equal fashion. [Citation.] At the other end of the spectrum is the 'beyond a reasonable doubt' standard applied in criminal cases, in which 'our society imposes almost the entire risk of error upon itself.' [Citation.] Between those two standards is the intermediate standard of clear and convincing evidence. [Citation.] These three standards are codified in California's Evidence

---

[13]     The People do not dispute defendant's claim the burden of proof lies with the prosecution. (E.g., *People v. Flores* (2014) 227 Cal.App.4th 1070, 1075-1076; *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1301, fn. 25 (*Kaulick*).) The trial court here expressly placed the burden on the People.

Code. Section 115 of that code states: 'The burden of proof may require a party to . . . establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt. [¶] *Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence*.' (Italics added.)

"If the Legislature has not established a standard of proof, a court must determine the appropriate standard by considering all aspects of the law. [Citation.] No standard of proof is specified in section [1170.126] . . . .

" 'The standard of proof that is required in a given instance has been said to reflect ". . . the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.". . . The standard of proof may therefore vary, depending upon the gravity of the consequences that would result from an erroneous determination of the issue involved.' [Citations.]" (*People v. Arriaga* (2014) 58 Cal.4th 950, 961-962.)

"In enacting section 1170.126 as part of Proposition 36, the issue before the voters was not whether a defendant could or should be punished more harshly for a particular aspect of his or her offense, but whether, having already been found to warrant an indeterminate life sentence as a third strike offender, he or she should now be eligible for a lesser term." (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1036.) Although voters could have permitted automatic resentencing, under any and all circumstances, of those eligible therefor, they did not do so. This demonstrates a recognition of two highly plausible scenarios: (1) Some inmates sentenced to indeterminate terms under the original version of the three strikes law for crimes not defined as serious or violent felonies may have started out not posing any greater risk of danger than recidivists who will now be sentenced to determinate terms as second strike offenders under the prospective provisions of the Act, but have become violent or otherwise dangerous while imprisoned, or (2) Enough time might have passed since some inmates committed their criminal offenses so that those offenses no longer make such inmates dangerous, but other factors do. Because of the severe consequences to society that may result if a

16.

dangerous inmate is resentenced as a second strike offender and released to the community upon completion of his or her term with little or no supervision (see, e.g., § 3451) and without undergoing any suitability assessment (see, e.g., *In re Lawrence* (2008) 44 Cal.4th 1181, 1204), we believe it appropriate to apportion the risk of error in roughly equal fashion.

Division Three of the Second District Court of Appeal has stated that, where a court's discretion under section 1170.126, subdivision (f) is concerned, the People bear the burden of proving "dangerousness" by a preponderance of the evidence. (*Kaulick*, *supra*, 215 Cal.App.4th at pp. 1301-1305 & fn. 25; see Evid. Code, § 115.) That court determined this is so because "dangerousness is not a factor which enhances the sentence imposed when a defendant is resentenced under the Act; instead, dangerousness is a hurdle which must be crossed in order for a defendant to be resentenced at all." (*Kaulick*, *supra*, at p. 1303.) *Kaulick* explained: "The maximum sentence to which Kaulick, and those similarly situated to him, is subject was, and shall always be, the indeterminate life term to which he was originally sentenced. While [the Act] presents him with an opportunity to be resentenced to a lesser term, unless certain facts are established, he is nonetheless still subject to the third strike sentence based on the facts established at the time he was originally sentenced. As such, a court's discretionary decision to decline to modify the sentence in his favor can be based on any otherwise appropriate factor (i.e., dangerousness), and such factor need not be established by proof beyond a reasonable doubt to a jury." (*Ibid.*)

In *People v. Blakely* (2014) 225 Cal.App.4th 1042, 1059-1062 (*Blakely*), we rejected the claim an inmate seeking resentencing pursuant to section 1170.126 had a Sixth Amendment right to a jury determination, beyond a reasonable doubt, on the question of conduct constituting a disqualifying factor. We concluded that *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny (e.g., *Alleyne v. United States* (2013) 570 U.S. ___ [133 S.Ct. 2151]; *Cunningham v. California* (2007) 549 U.S.

17.

270 (*Cunningham*); *Blakely v. Washington* (2004) 542 U.S. 296) "do not apply to a determination of eligibility for resentencing under the Act." (*Blakely*, *supra*, 225 Cal.App.4th at p. 1060.) We also relied heavily on *Kaulick*.

In rejecting application of the beyond a reasonable doubt standard, *Kaulick* discussed the United States Supreme Court's conclusion in *Dillon v. United States* (2010) 560 U.S. 817, 828 (*Dillon*), that "a defendant's Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt do not apply to limits on downward sentence modifications due to intervening laws." (*Kaulick*, *supra*, 215 Cal.App.4th at p. 1304.) *Kaulick* found *Dillon*'s language applicable. Since the retrospective part of the Act is not constitutionally required, but an act of lenity on the part of the electorate and provides for a proceeding where the original sentence may be modified downward, any facts found at such a proceeding, such as dangerousness, do not implicate Sixth Amendment issues. Thus, there is no constitutional requirement that the facts be established beyond a reasonable doubt. (*Kaulick*, *supra*, at pp. 1304-1305.)[14]

Although in *Blakely* we applied *Kaulick*'s analysis to the initial determination of eligibility for resentencing under the Act (*Blakely*, *supra*, 225 Cal.App.4th at p. 1061), it applies equally to the issue whether resentencing the petitioner would pose an unreasonable risk of danger to public safety. A denial of an inmate's petition does not increase the penalty to which the inmate is already subject, but instead removes the inmate from the scope of an act of lenity on the part of the electorate to which he or she is not constitutionally entitled. (*Id.* at p. 1062.) That the denial is based on a determination of dangerousness does not change that conclusion.

---

**14**    Neither *Descamps v. United States* (2013) 570 U.S. ___ [133 S.Ct. 2276] nor *Pepper v. United States* (2011) 562 U.S. 476 undermines *Dillon* or *Kaulick*'s reliance thereon. Unlike *Dillon*, *Descamps* dealt with judicial factfinding concerning a prior conviction used to *enhance* a sentence (*Descamps*, *supra*, 570 U.S. at pp. ___-___ [133 S.Ct. at pp. 2281-2282]), while *Pepper* involved a plenary resentencing after the defendant's sentence had been set aside on appeal (*Pepper*, *supra*, 562 U.S. at p. 481).

18.

*Kaulick* found the prosecution bears the burden of establishing "dangerousness" by a preponderance of the evidence against a claim the *Apprendi* line of cases requires proof beyond a reasonable doubt. (*Kaulick*, *supra*, 215 Cal.App.4th at pp. 1301-1302.) As a result, it had no real occasion to address the interplay between the burden of proof and the trial court's exercise of discretion as that issue is presented here, or to clarify whether the prosecution is required to establish "dangerousness" in the sense of *facts* upon which the trial court can base the ultimate determination resentencing a petitioner would pose an unreasonable risk of danger to public safety, or in the sense of establishing that determination itself.[15] Nevertheless, we believe it supports our interpretation.

Accordingly, we hold preponderance of the evidence is the applicable standard of proof, regardless whether we analyze the issue as one of Sixth Amendment jurisprudence or due process. (See *People v. Flores*, *supra*, 227 Cal.App.4th at p. 1076.)[16]

This does not, however, mean the trial court must apply that standard in making its ultimate determination whether to resentence a petitioner, or we must review that determination for substantial evidence. Nor does it mean evidence of dangerousness must preponderate over evidence of rehabilitation for resentencing to be denied.

---

**15**    As noted, *ante*, we have previously discussed *Kaulick* in the context of the initial determination whether an inmate is eligible for resentencing under the Act. (*Blakely*, *supra*, 225 Cal.App.4th at pp. 1058, 1060-1061; *People v. Osuna*, *supra*, 225 Cal.App.4th at pp. 1033, 1039-1040.) Nothing we say here should be taken as disagreement with or modification of those opinions. We deal here with a different aspect of the retrospective portion of the Act and a subject not before us in our prior cases.

**16**    We recognize that in the case of people who are involuntarily committed as narcotics addicts or for analogous reasons, the California Supreme Court has found the appropriate standard of proof to be beyond a reasonable doubt. (See, e.g., *People v. Thomas* (1977) 19 Cal.3d 630, 637-638.) Defendant received the protections of that standard of proof (and the right to a jury trial) at the time he was convicted of his commitment offense and was found to have suffered his prior strike convictions. (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1015; *People v. Towers* (2007) 150 Cal.App.4th 1273, 1277.)

The language of section 1170.126, subdivision (f) expressly provides the petitioner shall be resentenced unless the court, in its discretion, makes a determination that resentencing would pose an unreasonable risk of danger to public safety. The statute does not say the petitioner shall be resentenced unless the People prove resentencing would pose such a risk.

Considering the language of subdivisions (f) and (g) of section 1170.126, we conclude the People have the burden of establishing, by a preponderance of the evidence, facts from which a determination resentencing the petitioner would pose an unreasonable risk of danger to public safety can reasonably be made. The reasons a trial court finds resentencing would pose an unreasonable risk of danger, or its weighing of evidence showing dangerousness versus evidence showing rehabilitation, lie within the court's discretion. The ultimate determination that resentencing would pose an unreasonable risk of danger is a discretionary one. While the determination must be supported by facts established by a preponderance, the trial court need not itself find an unreasonable risk of danger by a preponderance of the evidence. (See *In re Robert L.*, *supra*, 21 Cal.App.4th at pp. 1065-1067 [discussing abuse of discretion and preponderance of the evidence standards].)

Such an interpretation is consistent with California's noncapital sentencing scheme.[17] Under the determinate sentencing law (DSL) as it existed prior to *Cunningham*, "three terms of imprisonment [were] specified by statute for most offenses. The trial court's discretion in selecting among [those] options [was] limited by section 1170, subdivision (b), which direct[ed] that 'the court shall order imposition of the

---

[17] The determination of the appropriate penalty in a capital case " 'is "essentially moral and normative [citation], and therefore . . . there is no burden of proof or burden of persuasion. [Citation.]" [Citation.]' [Citations.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1362, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

20.

middle term, unless there are circumstances in aggravation or mitigation of the crime.' "
(*People v. Black* (2007) 41 Cal.4th 799, 808, fn. omitted.)  Trial courts had "broad discretion" to impose the lower or upper term instead of the middle term of imprisonment (*People v. Scott* (1994) 9 Cal.4th 331, 349), and generally were required by the statutes and sentencing rules to state reasons for their discretionary sentencing choices (*ibid*.).  Such reasons had to be "supported by a preponderance of the evidence in the record" and reasonably related to the particular sentencing determination.  (*Ibid*.; see former Cal. Rules of Court, rule 4.420(b).)  Even after the DSL was reformed and amended in response to *Cunningham*, so as to eliminate judicial factfinding in selection of the appropriate term when three possible prison terms are specified by statute, establishment of facts by a preponderance of the evidence remains necessary with respect to certain discretionary sentencing decisions.  (See *In re Coley* (2012) 55 Cal.4th 524, 557-558.)[18]

In *People v. Sandoval* (2007) 41 Cal.4th 825, 850-851, the California Supreme Court stated that, in making its discretionary sentencing choices post-*Cunningham*, "the trial court need only 'state [its] reasons' [citation]; it is not required to identify aggravating and mitigating factors, *apply a preponderance of the evidence standard*, or specify the 'ultimate facts' that 'justify[] the term selected.' [Citations.]  Rather, the court must 'state in simple language the primary factor or factors that support the exercise of discretion.' [Citation.]" (Italics added.)

The trial court's ultimate determination when considering a petition for resentencing under section 1170.126 is analogous to an evaluation of the relative weight

---

[18] After *Cunningham* concluded the DSL violated a defendant's Sixth Amendment right to a jury trial (*Cunningham*, *supra*, 549 U.S. at p. 281), the Legislature amended section 1170 so that "(1) the middle term is no longer the presumptive term absent aggravating or mitigating facts found by the trial judge; and (2) a trial judge has the discretion to impose an upper, middle or lower term based on reasons he or she states." (*People v. Wilson* (2008) 164 Cal.App.4th 988, 992.)  Subdivision (b) of section 1170 states the court "shall select the term which, in the court's discretion, best serves the interests of justice."

of mitigating and aggravating circumstances. Such an evaluation "is not equivalent to a factual finding." (*People v. Black*, *supra*, 41 Cal.4th at p. 814, fn. 4.) It follows, then, that the trial court need not apply a preponderance of the evidence standard, in that it need not find resentencing the petitioner would, more likely than not, pose an unreasonable risk of danger to public safety. (See *Kaulick*, *supra*, 215 Cal.App.4th at p. 1305, fn. 28 [preponderance standard means " 'more likely than not' "].)[19]

To summarize, a trial court need not determine, by a preponderance of the evidence, that resentencing a petitioner would pose an unreasonable risk of danger to public safety before it can properly deny a petition for resentencing under the Act. Nor is the court's ultimate determination subject to substantial evidence review. Rather, its finding will be upheld if it does not constitute an abuse of discretion, i.e., if it falls within

---

[19]    We reject defendant's claim that if there need only be substantial evidence of the underlying facts, then review of the ultimate dangerousness determination for abuse of discretion is no more stringent than the highly deferential "some evidence" standard applicable to review of executive branch decisions in parole cases. (See *In re Rosenkrantz* (2002) 29 Cal.4th 616, 658, 665.) Whatever the similarities between the "abuse of discretion" and "some evidence" standards (compare *People v. Giordano* (2007) 42 Cal.4th 644, 663 [abuse of discretion standard is " 'deferential' " but " 'not empty' "] with *In re Lawrence*, *supra*, 44 Cal.4th at p. 1210 ["some evidence" standard is "unquestionably deferential" but "not toothless"]), examining the underlying facts for substantial evidence requires us to " 'review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the [challenged fact by a preponderance of the evidence]. [Citations.]' [Citation.] We resolve all conflicts in the evidence and questions of credibility in favor of the [finding], and we indulge every reasonable inference the [trier of fact] could draw from the evidence. [Citation.]" (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1444.) Moreover, as we have observed, the language of section 1170.126, subdivisions (f) and (g) expressly allocates to the trial court's discretion the ultimate determination of dangerousness. A review of the trial court's exercise of discretion requires a determination whether that court reasonably and nonarbitrarily found resentencing the petitioner would pose an unreasonable risk of danger to public safety, and not merely a review of whether evidence established the facts of that inmate's criminal and disciplinary history. (See *People v. Williams*, *supra*, 17 Cal.4th at p. 162; *People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.)

22.

"the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) The facts upon which the court's finding of unreasonable risk is based must be proven by the People by a preponderance of the evidence, however, and are themselves subject to our review for substantial evidence. If a factor (for example, that the petitioner participated in a riot, is violent due to repeated instances of mutual combat, etc.) is not established by a preponderance of the evidence, it cannot form the basis for a finding of unreasonable risk. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 [trial court abuses its discretion when factual findings critical to decision find no support in record]; cf. *People v. Read* (1990) 221 Cal.App.3d 685, 689-691 [where trial court erroneously determined the defendant was statutorily ineligible for probation, reviewing court had to decide whether trial court gave sufficient other reasons, supported by facts of case, for probation denial].)

> C.  *Section 1170.126 does not establish or contain a presumption a petitioner's sentence must be reduced.*

Subdivision (f) of section 1170.126 provides that an eligible petitioner "shall be resentenced" as a second strike offender "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." Defendant contends this language creates a presumption in favor of resentencing.

Defendant first points to the "shall"/"unless" formulation employed by the statute. Under *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142 and its progeny (e.g., *People v. Murray* (2012) 203 Cal.App.4th 277, 282; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089), all of which deal with section 190.5, subdivision (b),[20]

---

[20]  Section 190.5, subdivision (b) provides, in pertinent part: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true . . . , who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be

23.

defendant argues that at the time Proposition 36 was enacted, it had long been the law that the "shall" option was the presumptive punishment, and so voters must have intended this then-prevailing judicial interpretation to apply. (See *People v. Harrison* (1989) 48 Cal.3d 321, 329; *People v. Weidert* (1985) 39 Cal.3d 836, 844.)

The California Supreme Court disapproved the foregoing line of cases in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370, 1387. Leaving aside constitutional questions raised by establishing a presumption in favor of life without parole for juveniles after the United States Supreme Court's opinion in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455], the state high court's review of the text of section 190.5, subdivision (b) led it to conclude the syntax is ambiguous concerning any presumption. The court stated: "It is not unreasonable to read this text . . . to mean that a court 'shall' impose life without parole unless 'at the discretion of the court' a sentence of 25 years to life appears more appropriate. [Citation.] But it is equally reasonable to read the text to mean that a court may select one of the two penalties in the exercise of its discretion, with no presumption in favor of one or the other. The latter reading accords with common usage. For example, if a teacher informed her students that 'you must take a final exam or, at your discretion, write a term paper,' it would be reasonable for the students to believe they were equally free to pursue either option. The text of section 190.5[, subdivision ](b) does not clearly indicate whether the statute was intended to make life without parole the presumptive sentence." (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1371.)

The same example can be applied to the syntax of section 1170.126, subdivision (f). Because a reading that affords no presumption "accords with common usage" (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1371), we reject the notion voters must have intended there to be a presumption in favor of resentencing or that courts have

confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

only limited discretion to deny resentencing (see *People v. Carmony*, *supra*, 33 Cal.4th at pp. 377-378 [discussing courts' circumscribed power to depart, under § 1385, subd. (a) and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530 (*Romero*), from sentencing norm established by three strikes law]). A court considering whether to resentence an eligible petitioner under section 1170.126, subdivision (f) has circumscribed discretion in the sense it can only refuse to resentence if it finds that to do so would pose an unreasonable risk of danger to public safety on the facts of the particular case before it.[21] This does not mean, however, its discretion is circumscribed in the sense it can only find dangerousness in extraordinary cases. To the contrary, it can do so in any case in which such a finding is rational under the totality of the circumstances.

Such a conclusion comports with the plain language of the statute. Moreover, a conclusion resentencing to a second strike term is a generally mandatory presumption from which courts can depart only in extraordinary cases, as defendant asserts, would run directly contrary to the intent of the voters in passing the Act. (See *People v. Gutierrez*, *supra*, 58 Cal.4th at pp. 1371-1372 [examining legislative history and voter intent in attempt to resolve statutory ambiguity].) As we stated in *People v. Osuna*, *supra*, 225 Cal.App.4th at page 1036, " '[e]nhancing public safety was a key purpose of the Act' [citation]." Thus, although one purpose of the Act was to save taxpayer dollars (*People v. Osuna*, *supra*, at p. 1037), "[i]t is clear the electorate's intent was not to throw open the prison doors to *all* third strike offenders whose current convictions were not for serious or violent felonies, but *only* to those who were perceived as nondangerous or posing little or

---

[21] Because a trial court can deny resentencing under section 1170.126, subdivision (f) only upon a finding of unreasonable risk of danger to public safety, a trial court would abuse its discretion, as in a *Romero* situation, by refusing to resentence a petitioner because of antipathy toward the Act or a personal belief a particular defendant deserved an indeterminate term for reasons other than dangerousness. (See *People v. Williams*, *supra*, 17 Cal.4th at pp. 159, 161.)

no risk to the public" (*id*. at p. 1038, second italics added). Had voters intended to permit retention of an indeterminate term only in extraordinary cases, they would have said so in subdivision (f) of section 1170.126, rather than employing language that affords courts broad discretion to find dangerousness. They also would not have afforded the trial court the power to consider any evidence it determined to be relevant to the issue as they did in subdivision (g)(3) of the statute.

     D.    *Section 1170.18, subdivision (c), enacted pursuant to Proposition 47, does not modify section 1170.126, subdivision (f).*

On November 4, 2014, voters enacted Proposition 47, "the Safe Neighborhoods and Schools Act" (hereafter Proposition 47). It went into effect the next day. (Cal. Const., art. II, § 10, subd. (a).) Insofar as is pertinent here, Proposition 47 reduced to misdemeanors certain drug- and theft-related offenses that previously were felonies or "wobblers," unless they were committed by certain ineligible defendants. Proposition 47 also created a new resentencing provision — section 1170.18 — by which a person currently serving a felony sentence for an offense that is now a misdemeanor, may petition for a recall of that sentence and request resentencing in accordance with the offense statutes as added or amended by Proposition 47. (§ 1170.18, subd. (a).) A person who satisfies the criteria in subdivision (a) of section 1170.18 shall have his or her sentence recalled and be "resentenced to a misdemeanor . . . unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (*Id*., subd. (b).)[22]

Hidden in the lengthy, fairly abstruse text of the proposed law, as presented in the official ballot pamphlet — and nowhere called to voters' attention — is the provision defendant contends applies to his petition for resentencing under Proposition 36.

_____

[22]    Proposition 47 also created a process whereby eligible persons who have already completed their sentences may have the particular conviction or convictions designated as misdemeanors. (§ 1170.18, subds. (f), (g).)

Subdivision (c) of section 1170.18 provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." Section 667, subdivision (e)(2)(C)(iv) lists the following felonies, sometimes called "super strike" offenses:

> "(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

> "(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

> "(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

> "(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.

> "(V) Solicitation to commit murder as defined in Section 653f.

> "(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

> "(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

> "(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

The question is whether section 1170.18, subdivision (c) now limits a trial court's discretion to deny resentencing under the Act to those cases in which resentencing the

27.

defendant would pose an unreasonable risk he or she will commit a new "super strike" offense. Defendant says it does. The People disagree. We agree with the People.[23]

" 'In interpreting a voter initiative . . . , we apply the same principles that govern statutory construction. [Citation.]' [Citation.] ' "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.]" ' [Citation.]" (*People v. Superior Court (Cervantes)* (2014) 225 Cal.App.4th 1007, 1014.) Thus, in the case of a provision adopted by the voters, "their intent governs. [Citations.]" (*People v. Jones* (1993) 5 Cal.4th 1142, 1146.)

To determine intent, " 'we look first to the words themselves. [Citations.]' " (*People v. Superior Court (Cervantes)*, *supra*, 225 Cal.App.4th at p. 1014.) We give the statute's words " 'a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language "in isolation." [Citation.] Rather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' [Citation.]" [Citation.] We must harmonize "the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a

---

[23]    It appears that a number of inmates will be eligible to seek resentencing under both the Act and Proposition 47. Such an inmate need not wait to file a petition under Proposition 47 until the trial court's ruling on the inmate's petition under the Act is final. A trial court is not divested of jurisdiction over a Proposition 47 petition by the fact a petition under the Act is pending, whether in a trial court or a Court of Appeal, with respect to the same inmate. (Cf. *People v. Mayfield* (1993) 5 Cal.4th 220, 222-227; *People v. Johnson* (1992) 3 Cal.4th 1183, 1256-1257; *People v. Alanis* (2008) 158 Cal.App.4th 1467, 1472-1473.) While the general rule is that "an appeal from an order in a criminal case removes the subject matter of that order from the jurisdiction of the trial court [citations] . . ." (*Anderson v. Superior Court* (1967) 66 Cal.2d 863, 865), the subject matter of a ruling on a petition under the Act is legally independent from a petition under Proposition 47 (see *People v. Superior Court (Gregory)* (2005) 129 Cal.App.4th 324, 332).

whole." [Citations.]' [Citation.]" (*People v. Acosta* (2002) 29 Cal.4th 105, 112.) We "accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. . . . [S]tatutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)

" ' "When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it." [Citation.]' [Citation.]" (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.) On its face, "[a]s used throughout this Code," as employed in section 1170.18, subdivision (c), clearly and unambiguously refers to the Penal Code, not merely section 1170.18 or the other provisions contained in Proposition 47. (See *People v. Bucchierre* (1943) 57 Cal.App.2d 153, 164-165; see also *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1254-1255; *People v. Vasquez* (1992) 7 Cal.App.4th 763, 766.) This does not mean, however, that the definition contained in section 1170.18, subdivision (c) must inexorably be read into section 1170.126, subdivision (f). (Cf. *Marshall v. Pasadena Unified School Dist.*, *supra*, 119 Cal.App.4th at p. 1255.) "The literal language of a statute does not prevail if it conflicts with the lawmakers' intent . . . . [Citations.]" (*People v. Osuna*, *supra*, 225 Cal.App.4th at pp. 1033-1034.) " 'The apparent purpose of a statute will not be sacrificed to a literal construction.' [Citation.]" (*Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 733.) Rather, "the literal meaning of a statute must be in accord with its purpose." (*People v. Mohammed* (2008) 162 Cal.App.4th 920, 927.) "[I]t is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the [voters] did not intend" (*In re Michele D.* (2002) 29 Cal.4th 600, 606), or would "frustrate[] the manifest purposes of the legislation as a whole . . . ." (*People v. Williams* (1992) 10 Cal.App.4th 1389, 1393.) "To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit

29.

of the enactment. [Citation.]" (*In re Michele D.*, *supra*, 29 Cal.4th at p. 606; accord, *People v. Ledesma* (1997) 16 Cal.4th 90, 95.)

Thus, " 'we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]' [Citation.] We also ' "refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.]" (*People v. Osuna*, *supra*, 225 Cal.App.4th at p. 1034.) We consider "the consequences that will flow from a particular interpretation" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1387), as well as "the wider historical circumstances" of the statute's or statutes' enactment (*ibid.*). " 'Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the [electorate], with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*People v. Osuna*, *supra*, 225 Cal.App.4th at pp. 1034-1035.)

Proposition 47 and the Act address related, but not identical, subjects. As we explain, reading them together, and considering section 1170.18, subdivision (c) in the context of the statutory framework as a whole (see *People v. Acosta*, *supra*, 29 Cal.4th at p. 112; *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659; *In re Cindy B.* (1987) 192 Cal.App.3d 771, 781), we conclude its literal meaning does not comport with the purpose of the Act, and applying it to resentencing proceedings under the Act would frustrate, rather than promote, that purpose and the intent of the electorate in enacting both initiative measures (see *People v. Disibio* (1992) 7 Cal.App.4th Supp. 1, 5).

As is evidenced by its title, the Act was aimed solely at revising the three strikes law. That law, as originally enacted by the Legislature, was described by us as follows:

30.

"Under the three strikes law, defendants are punished not just for their current offense but for their recidivism. Recidivism in the commission of multiple felonies poses a danger to society justifying the imposition of longer sentences for subsequent offenses. [Citation.] The primary goals of recidivist statutes are: '. . . to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes. Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.' [Citation.]

"By enacting the three strikes law, the Legislature acknowledged the will of Californians that the goals of retribution, deterrence, and incapacitation be given precedence in determining the appropriate punishment for crimes. Further, those goals were best achieved by ensuring 'longer prison sentences and greater punishment' for second and third 'strikers.' " (*People v. Cooper* (1996) 43 Cal.App.4th 815, 823-824.)[24]

A few months before the November 6, 2012, general election, the California Supreme Court observed: "One aspect of the [three strikes] law that has proven controversial is that the lengthy punishment prescribed by the law may be imposed not only when . . . a defendant [who has previously been convicted of one or more serious or violent felonies] is convicted of another serious or violent felony but also when he or she is convicted of any offense that is categorized under California law as a felony. This is so even when the current, so-called triggering, offense is nonviolent and may be widely

---

[24] The foregoing applies equally to the three strikes initiative measure that added section 1170.12 to the Penal Code. The following statement of intent preceded the text of the statute in Proposition 184, which was approved by voters on November 8, 1994: " 'It is the intent of the People of the State of California in enacting this measure to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses.' " (Historical and Statutory Notes, 50C West's Ann. Pen. Code (2015 ed.) foll. § 1170.12, p. 376.)

perceived as relatively minor. [Citations.]" (*In re Coley*, *supra*, 55 Cal.4th at pp. 528-529.)

Clearly, by approving the Act, voters resolved this controversy in favor of strike offenders. Thus, one of the "Findings and Declarations" of the Act stated the Act would "[r]estore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) text of Prop. 36, § 1, p. 105.)[25] Nowhere, however, do the ballot materials for the Act suggest voters intended essentially to release existing third strike offenders in all but the most egregious cases, as would be the result if the definition of " 'unreasonable risk of danger to public safety' " contained in section 1170.18, subdivision (c) were engrafted onto resentencing proceedings under section 1170.126, subdivision (f). That voters did *not* intend such a result is amply demonstrated by the fact an indeterminate life term remains mandatory under the Act for a wide range of current offenses even if the offender does not have a prior conviction for a "super strike" offense (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)), and that an inmate is rendered ineligible for resentencing under section 1170.126 for an array of reasons beyond his or her having suffered such a prior conviction (§ 1170.126, subd. (e)(2)).

The Act clearly placed public safety above the cost savings likely to accrue as a result of its enactment. Thus, uncodified section 7 of the Act provides: "This act is an exercise of the public power of the people of the State of California *for the protection of the health, safety, and welfare of the people of the State of California*, and shall be liberally construed to effectuate those purposes." (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 36, p. 110, some italics omitted.) As we explained in *People v.*

---

[25] The voter information guides for both the November 6, 2012, general election (which contains Prop. 36) and the November 4, 2014, general election (which contains Prop. 47) can be accessed at <http://www.sos.ca.gov/elections/voting-resources/voter-information-guides/> [as of Oct. 27, 2016].

*Osuna*, *supra*, 225 Cal.App.4th at page 1036, "Although the Act 'diluted' the three strikes law somewhat [citation], '[e]nhancing public safety was a key purpose of the Act' [citation]."

In contrast, Proposition 47 — while titled "the Safe Neighborhoods and Schools Act" — emphasized monetary savings. The "Findings and Declarations" state: "The people of the State of California find and declare as follows: [¶] The people enact the Safe Neighborhoods and Schools Act to ensure that prison spending is focused on violent and serious offenses, to maximize alternatives for nonserious, nonviolent crime, and to invest the savings generated from this act into prevention and support programs in K-12 schools, victim services, and mental health and drug treatment. This act ensures that sentences for people convicted of dangerous crimes like rape, murder, and child molestation are not changed." (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 2, p. 70.) Uncodified section 15 of the measure provides: "This act shall be broadly construed to accomplish its purposes," while uncodified section 18 states: "This act shall be liberally construed to effectuate its purposes." (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 47, p. 74.) Proposition 47 requires misdemeanor sentences for various drug possession and property offenses, unless the perpetrator has a prior conviction for a "super strike" offense or for an offense requiring sex offender registration pursuant to section 290, subdivision (c). (Health & Saf. Code, §§ 11350, subd. (a), 11357, subd. (a), 11377, subd. (a); §§ 459.5, subd. (a), 473, subd. (b), 476a, subd. (b), 490.2, subd. (a), 496, subd. (a), 666, subd. (b).) Section 1170.18 renders ineligible for resentencing *only* those inmates whose current offense would now be a misdemeanor, but who have a prior conviction for a "super strike" offense or for an offense requiring sex offender registration pursuant to section 290, subdivision (c). (§ 1170.18, subds. (a), (i).)

Nowhere in the ballot materials for Proposition 47 were voters given any indication that initiative, which dealt with offenders whose current convictions would

33.

now be misdemeanors rather than felonies, had any impact on Proposition 36 — enacted a scant two years earlier — which dealt with offenders whose current convictions *would still be felonies*, albeit not third strikes. For instance, the "Official Title and Summary" stated, in pertinent part, that Proposition 47 would "[r]equire[] resentencing for persons serving felony sentences for these offenses [(i.e., offenses that require misdemeanor sentences under the measure),] unless court finds unreasonable public safety risk." (Voter Information Guide, Gen. Elec., *supra*, official title and summary of Prop. 47, p. 34.) In explaining what Proposition 47 would do, the Legislative Analyst stated: "This measure reduces penalties for certain offenders convicted of *nonserious and nonviolent property and drug crimes*. The measure also allows certain offenders *who have been previously convicted of such crimes* to apply for reduced sentences." (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 47 by Legis. Analyst, p. 35, italics added.) With respect to the resentencing provision, the Legislative Analyst explained: "This measure allows offenders *currently serving felony sentences for the above crimes* [(i.e., grand theft, shoplifting, receiving stolen property, writing bad checks, check forgery, and drug possession)] to apply to have their felony sentences reduced to misdemeanor sentences. In addition, certain offenders who have already completed a sentence for a felony that the measure changes could apply to the court to have their felony conviction changed to a misdemeanor. However, no offender who has committed a specified severe crime could be resentenced or have their conviction changed. In addition, the measure states that a court is not required to resentence an offender currently serving a felony sentence if the court finds it likely that the offender will commit a specified severe crime. Offenders who are resentenced would be required to be on state parole for one year, unless the judge chooses to remove that requirement." (*Id*. at p. 36, italics added.)

Similarly, the arguments in favor of and against Proposition 47 spoke in terms solely of Proposition 47, and never mentioned the Act. The "Argument in Favor of

Proposition 47" talked of prioritizing serious and violent crime so as to stop wasting prison space "on petty crimes," stop "wasting money on warehousing people in prisons for nonviolent petty crimes," and stop California's overcrowded prisons from "incarcerating too many people convicted of low-level, nonviolent offenses." (Voter Information guide, Gen. Elec., *supra*, argument in favor of Prop. 47, p. 38.) The "Rebuttal to Argument Against Proposition 47" reiterated these themes, and never suggested Proposition 47 would have any effect on resentencing under the Act. (See Voter Information Guide, Gen. Elec., *supra*, rebuttal to argument against Prop. 47, p. 39.) Although the "Rebuttal to Argument in Favor of Proposition 47" asserted 10,000 inmates would be eligible for early release under the measure, and that many of them had prior convictions "for serious crimes, such as assault, robbery and home burglary" (Voter Information Guide, Gen. Elec., *supra*, rebuttal to argument in favor of Prop. 47, p. 38), it contained no suggestion the early release provisions would extend to inmates whose current offenses remained felonies under the Act. The same is true of the discussion of resentencing contained in the "Argument Against Proposition 47." (Voter Information Guide, Gen. Elec., *supra*, argument against Prop. 47, p. 39.)

In light of the foregoing, we cannot reasonably conclude voters intended the definition of " 'unreasonable risk of danger to public safety' " contained in section 1170.18, subdivision (c) to apply to that phrase as it appears in section 1170.126, subdivision (f), despite the former section's preamble, "As used throughout this Code . . . ." Voters cannot intend something of which they are unaware.

We are mindful "it has long been settled that '[t]he enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' [citation], 'and to have enacted or amended a statute in light thereof' [citation]. 'This principle applies to legislation enacted by initiative. [Citation.]' [Citation.]" (*People v. Superior Court (Cervantes)*, *supra*, 225 Cal.App.4th at p. 1015; accord, *In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11.) Thus, we presume voters were aware

35.

"unreasonable risk of danger to public safety," as used in section 1170.126, subdivision (f), had been judicially construed as not being impermissibly vague, but as nevertheless having no fixed definition. (*People v. Garcia* (2014) 230 Cal.App.4th 763, 769-770; *People v. Flores*, *supra*, 227 Cal.App.4th at p. 1075.) Because nowhere in the ballot materials for Proposition 47 was it called to voters' attention the definition of the phrase contained in section 1170.18, subdivision (c) would apply to resentencing proceedings under the Act, we simply cannot conclude voters intended Proposition 47 to alter the Act in that respect.[26] Voters are not asked or presumed to be able to discern all potential effects of a proposed initiative measure; this is why they are provided with voter information guides containing not only the actual text of such a measure, but also a neutral explanation and analysis by the Legislative Analyst and arguments in support of and in opposition to the measure. As we have already observed, none of those materials so much as hinted that Proposition 47 could have the slightest effect on resentencing under the Act. (Cf. *Marshall v. Pasadena Unified School Dist.*, *supra*, 119 Cal.App.4th

---

[26] That one of the authors of both measures may have so intended (St. John & Gerber, *Prop. 47 jolts landscape of California justice system* (Nov. 5, 2014) Los Angeles Times <http://www.latimes.com/local/politics/la-me-ff-pol-proposition47-20141106-story.html> [as of Oct. 27, 2016]; see Stanford Law School Directory — Michael Romano <https://law.stanford.edu/directory/michael-romano/> [as of Oct. 27, 2016]) is, in light of the information actually conveyed to voters, of no import (see *People v. Garcia* (2002) 28 Cal.4th 1166, 1175-1176, fn. 5; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30).

The concurring opinion cites *People v. Cordova* (2016) 248 Cal.App.4th 543, 560-564, review granted August 31, 2016, S236179, as demonstrating the question whether Proposition 47 would affect petitions under the Act was widely debated in the state prior to the election. (Conc. opn. of Peña, J., pp. 4-5, *post*.) We are aware of no California Supreme Court authority identifying Internet and media sources as reliable bases for ascertaining voters' intent.

36.

at pp. 1255-1256 [legislative history of enactment included information bill would add definition of particular term to Pub. Contract Code].)**27**

Nor can we infer an intent to extend section 1170.18, subdivision (c)'s definition to proceedings under section 1170.126 because the phrase in question only appears in those sections of the Penal Code. The only resentencing mentioned in the Proposition 47 ballot materials was resentencing for inmates whose current offenses would be reduced to *misdemeanors*, not those who would still warrant *second strike felony terms*. There is a huge difference, both legally and in public safety risked, between someone with multiple prior serious and/or violent felony convictions whose current offense is (or would be, if committed today) a misdemeanor, and someone whose current offense is a felony. Accordingly, treating the two groups differently for resentencing purposes does not lead to absurd results, but rather is eminently logical.

We recognize it is an established rule of statutory construction "that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings. [Citations.]" (*People v. Caudillo* (1978) 21 Cal.3d 562, 585, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 229, 237, fn. 6 & disapproved on another ground in *People v. Escobar* (1992) 3 Cal.4th 740, 749-751 & fn. 5; see *Robbins v. Omnibus R. Co.* (1867) 32 Cal. 472, 474.) We question whether Proposition 36 and Proposition 47 are truly in pari materia: That phrase means "[o]n the same subject; relating to the same matter" (Black's Law Dict. (9th ed. 2009) p. 862), and the two measures (albeit with some overlap) address different levels of offenses and offenders. In any event, "canons of statutory construction are merely aids to ascertaining probable

---

**27** For the same reasons, we reject any suggestion the definition contained in section 1170.18, subdivision (c) was intended to clarify the true meaning of "unreasonable risk of danger to public safety" as used in section 1170.126, subdivision (f). (Cf. *Re-Open Rambla, Inc. v. Board of Supervisors* (1995) 39 Cal.App.4th 1499, 1511; *In re Connie M.* (1986) 176 Cal.App.3d 1225, 1238.)

legislative intent" (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 521, fn. 10); they are "mere guides and will not be applied so as to defeat the underlying legislative intent otherwise determined [citation]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1391).

The Act was intended to reform the three strikes law while keeping intact that scheme's core commitment to public safety. Allowing trial courts broad discretion to determine whether resentencing an eligible petitioner under the Act "would pose an unreasonable risk of danger to public safety" (§ 1170.126, subd. (f)) clearly furthers the Act's purpose. Whatever the wisdom of Proposition 47's policy of nearly universal resentencing where *misdemeanants* are concerned — and "[i]t is not for us to gainsay the wisdom of the legislative choice" (*Bernard v. Foley* (2006) 39 Cal.4th 794, 813) — constraining that discretion so that all but the worst *felony* offenders are released manifestly does not, nor does it comport with the voters' intent in enacting either measure. Accordingly, Proposition 47 has no effect on defendant's petition for resentencing under the Act.[28]

---

[28] Were we to find section 1170.18, subdivision (c) modifies section 1170.126, subdivision (f), we would conclude it does not do so retroactively. Section 3 — "No part of [the Penal Code] is retroactive, unless expressly so declared" — is the default rule. (*People v. Brown* (2012) 54 Cal.4th 314, 319.) *In re Estrada* (1965) 63 Cal.2d 740, 744-745, 747-748, which stands for the proposition that absent a "saving clause" providing for prospective application, a statute lessening punishment is presumed to apply to all cases not yet final on the statute's effective date, does not control, because applying the definition of " 'unreasonable risk of danger to public safety' " contained in section 1170.18, subdivision (c) to petitions for resentencing under the Act does not reduce punishment for a particular criminal offense. (See *People v. Brown*, *supra*, 54 Cal.4th at pp. 324-325.)

We believe, however, that a finding of nonretroactivity inexorably leads to the possibility of prospective-only application, and prospective-only application of Proposition 47's definition to resentencing petitions under the Act would raise serious, perhaps insurmountable, equal protection issues. (Indeed, the parties here engage in a spirited argument concerning equal protection.) "Mindful of the serious constitutional questions that might arise were we to accept a literal construction of the statutory

E.      *The focus in a section 1170.126, subdivision (f) analysis is on whether the petitioner currently poses an unreasonable risk of danger to public safety.*

Defendant contends there must be a "logical nexus" between the factors considered in the trial court's decision and current dangerousness. In support, he relies, in part, on parole cases.

In discussing the "some evidence" standard applicable in parole cases, the California Supreme Court has stated: "This standard is unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision — the determination of current dangerousness." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1210.)

Although we decline to decide how and to what extent parole cases inform the decision whether to resentence a petitioner under the Act or our review of such a decision, we agree with defendant that the proper focus is on whether the petitioner *currently* poses an unreasonable risk of danger to public safety. (Cf. *In re Shaputis* (2008) 44 Cal.4th 1241, 1254; *In re Lawrence*, *supra*, 44 Cal.4th at p. 1214.) We also agree a trial court may properly deny resentencing under the Act based solely on immutable facts such as a petitioner's criminal history "*only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.]" (*In re Lawrence*, *supra*, at p. 1221.) " '[T]he relevant inquiry is whether [a petitioner's prior criminal and/or disciplinary history], when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years [later]. This inquiry is . . . an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without

language, and of our obligation wherever possible both to carry out the intent of the electorate and to construe statutes so as to preserve their constitutionality [citations]" (*People v. Skinner* (1985) 39 Cal.3d 765, 769), we rest our holding on the reasoning set out in our opinion, *ante*.

39.

consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.  [Citation.]'  [Citation.]"  (*In re Shaputis*, *supra*, 44 Cal.4th at pp. 1254-1255.)

## II*

## <u>The Trial Court's Ruling</u>

Applying the foregoing principles, we conclude defendant has not borne his burden on appeal of establishing the trial court's ruling exceeds the bounds of reason. Defendant had a longstanding substance abuse problem, involving both alcohol and drugs.  As the trial court noted in its written denial of the petition for resentencing, despite having two prior convictions for driving under the influence and being sentenced to prison for 25 years to life for an offense during which he was driving under the influence, defendant continued his substance abuse in prison.  The trial court was not required to ignore this past behavior.  Although defendant clearly and commendably took steps to change his life and, insofar as the evidence showed, had been sober for some time, the evidence also showed him to have relapsed in the past.  In addition, although defendant professed to have realized that actions have consequences and to take responsibility for his actions, probation officers' reports (which the court considered without objection) showed defendant made similar pronouncements in the past and yet continued to offend.  His explanations for his past misconduct, both in and out of prison, suggested he tended to minimize that responsibility when confronted with those actions. Taking all the circumstances into account, the concerns expressed by the trial court in its ruling were neither unfounded nor unreasonable.

On appeal, defendant presents numerous arguments why his petition should have been granted.  As was the case with his testimony at the hearing, they tend to downplay the seriousness and potential consequences of his behavior.  In any event, "[a] record

---

\*      See footnote, *ante*, page 1.

presenting facts on which reasonable minds may differ is not a record establishing an abuse of discretion." (*People v. Moya* (1986) 184 Cal.App.3d 1307, 1313, fn. 2.)

## **DISPOSITION**

The order denying the petition is affirmed.

_____

DETJEN, Acting P.J.

I CONCUR:

_____

SMITH, J.

41.

PEÑA, J.,

I concur in the judgment and the majority opinion with the exception of part I.D. I agree defendant Victor Buford may not take advantage of Proposition 47's[1] newly enacted definition of "unreasonable risk of danger to public safety" as provided in Penal Code section 1170.18, subdivision (c) (§ 1170.18(c)). I do so not because there is any ambiguity in the language used in section 1170.18(c) or the notion that the statute does not mean what it says, i.e., that the new definition applies "throughout this Code." Rather, in my view, there is no indication the electorate, in enacting section 1170.18(c), intended it to apply retroactively to resentencing determinations under Proposition 36, the Three Strikes Reform Act of 2012 (the Act).[2]

## I.	After November 4, 2014, the definition of "unreasonable risk of danger" in Section 1170.18(c) applies throughout the Penal Code

Section 1170.18(c) provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667."

This section and subdivision were enacted on November 4, 2014, when California voters passed Proposition 47, long past the time of defendant's resentencing hearing. Unless the legislation was designed or intended to apply retroactively, the definition in section 1170.18(c) cannot apply to defendant. This is the only inquiry we must make to resolve the issue of whether the definition in section 1170.18(c) applies to defendant.

---

[1]The Safe Neighborhood and Schools Act (Prop. 47, as approved by voters, Gen. Elec. (Nov. 4, 2014)).

[2]The issue of whether Proposition 47's definition of unreasonable risk of danger to public safety applies in Proposition 36 resentencing proceedings is pending before the California Supreme Court in *People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted February 18, 2015, S223676, and *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted February 18, 2015, S223825.

However, the majority has opted to determine whether the new definition applies to any resentencing provisions for this or any future petitions under the Act. I respectfully disagree with the majority's analysis and conclusion on this broader issue.

> "'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law."' [Citations.] '[W]e begin with the words of a statute and give these words their ordinary meaning.' [Citation.] 'If the statutory language is clear and unambiguous, then we need go no further.' [Citation.] If, however, the language supports more than one reasonable construction, we may consider 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.] Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*People v. Sinohui* (2002) 28 Cal.4th 205, 211-212.)

Where the statutory language is so clear and unambiguous, there is no need for statutory construction or to resort to legislative materials or other outside sources. (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371.) Absent ambiguity, it is presumed the voters intend the meaning apparent on the face of an initiative measure, and the courts may not add to the statute or rewrite it to conform to a presumed intent not apparent in its language. (*People v. ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 301.)

In determining whether the words enacted here are unambiguous, we do not write on a blank slate. For example, in *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1255, the court stated there "is nothing ambiguous about the phrase 'as used in this code.'" It held the definition of "Emergency, as used in this code" applied to the entire Public Contract Code, and it was not limited to a particular chapter, article, or division of that code. Also, in *People v. Bucchierre* (1943) 57 Cal.App.2d 153,

166, the court held: "The words 'as in this code provided' (Penal Code, § 182) refer to the Penal Code."

In a similar vein, the court in *People v. Leal* (2004) 33 Cal.4th 999, 1007-1008, applied the plain meaning rule as follows:

> "The statutory language of the provision defining 'duress' in each of the rape statutes is clear and unambiguous. The definition of 'duress' in both the rape and spousal rape statutes begins with the phrase, 'As used in this section, "duress" means ….' (§§ 261, subd. (b), 262, subd. (c).) This clear language belies any legislative intent to apply the definitions of 'duress' in the rape and spousal rape statutes to any other sexual offenses.

> "Starting from the premise that in 1990 the Legislature incorporated into the rape statute a definition of 'duress' that already was in use for other sexual offenses, defendant argues that the Legislature must have intended its 1993 amendment of the definition of 'duress' in the rape statute, and the incorporation of this new definition into the spousal rape statute, to apply as well to other sexual offenses that use the term 'duress.' Defendant observes: 'The legislative history does not suggest any rationale for why the Legislature would want its 1993 amendment of the definition of "duress" to apply only to rape so that it would have one meaning when the rape statutes use the phrase "force, violence, duress, menace, or fear of immediate and unlawful bodily injury" but another, much more expansive meaning when the identical phrase is used in the statutes defining sodomy, lewd acts on a child, oral copulation and foreign object rape.'

> "But the Legislature was not required to set forth its reasons for providing a different definition of 'duress' for rape and spousal rape than has been used in other sexual offenses; it is clear that it did so. 'When "'statutory language is … clear and unambiguous there is no need for construction, and courts should not indulge in it.'" [Citations.] The plain meaning of words in a statute may be disregarded only when that meaning is "'repugnant to the general purview of the act,' or for some other compelling reason …." [Citations.]' [Citation.] As we said in an analogous situation: 'It is our task to construe, not to amend, the statute. "In the construction of a statute … the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted …." [Citation.] We may not, under the guise of construction, rewrite the law or

3.

give the words an effect different from the plain and direct import of the terms used.' [Citation.]"

The majority pays lip service to the plain meaning rule and then ignores it. While acknowledging the language used is unambiguous, it nonetheless engages in statutory construction to determine whether the electorate really intended to say what it actually enacted. The end result is a rewriting of the statute so that it comports with the majority's view of what the voters really intended. The majority has rewritten section 1170.18(c) so that it now states: "*As used in this section only*, 'unreasonable risk of danger to public safety' means …." (Italics added.) The majority does so without providing a compelling reason to do so and without showing the plain language used has a "'meaning [that] is "'repugnant to the general purview of the act.'"'" (*People v. Leal*, *supra*, 33 Cal.4th at p. 1008.) Because the Act had not previously defined the phrase "unreasonable risk of danger to public safety," the definition in section 1170.18(c) cannot be repugnant or contradictory to the Act, nor does the majority claim the definition is repugnant to the general purview of Proposition 47. For these reasons, I respectfully disagree with the majority on this part of the opinion.

I note the Sixth District Court of Appeal in *People v. Esparza* (2015) 242 Cal.App.4th 726, 734-737, has reached the same result as the majority here under nearly identical reasoning. There the court seemingly acknowledges that applying the plain meaning rule would not lead to absurd results. However, like the majority here, the court refused to give the words used their unambiguous, ordinary meaning, stating "we would need the most compelling proof that the voters intended what we see as an unreasonable and counterintuitive result." (*Id*. at p. 737.)

Subsequently, the Sixth Appellate District, in an opinion authored by one of the justices who concurred in the *Esparza* decision, reversed position after further reflection and further research on the public debate surrounding the passage of Proposition 47. (*People v. Cordova* (2016) 248 Cal.App.4th 543, 552, fn. 8, review granted Aug. 31,

4.

2016, S236179.)  The majority in *Cordova* extensively outlined in the opinion how the question of whether Proposition 47 could affect petitions under the Act was widely debated in the state by opponents of the measure.  (*Cordova*, *supra*, at pp. 560-564.)

The majority here dismisses these sources of information stating, "We are aware of no California Supreme Court authority identifying Internet and media sources as reliable bases for ascertaining voters' intent."  (Maj. opn., *ante*, at fn. 26, ¶ 2, p. 37.)  However, the *Cordova* case cites two such cases—*Brosnahan v. Brown* (1982) 32 Cal.3d 236 and *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208—that considered other informative sources on voter intent.  Conversely, the majority has cited to no case or authority that confines or otherwise limits the search for voters' intent to ballot summaries and arguments.  I quote from the *Brosnahan* case:

> "Finally, petitioners insist that the complexity of Proposition 8 may have led to confusion or deception among voters, who were assertedly uninformed regarding the contents of the measure.  Yet, as was the case in both *Amador* and *FPPC*,[3] Proposition 8 received widespread publicity.  Newspaper, radio and television editorials focused on its provisions, and extensive public debate involving candidates, letters to the editor, etc., described the pros and cons of the measure.…  [¶] … [¶]
>
> "Petitioners' entire argument that, in approving Proposition 8, the voters must have been misled or confused is based upon the improbable assumption that the people did not know what they were doing.…  Rather, in accordance with our tradition, '*we ordinarily should assume that the voters who approved a constitutional amendment "… have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election and which they must be assumed to have duly considered.*"'  [Citations.]"  (*Brosnahan v. Brown*, *supra*, 32 Cal.3d at pp. 251-252.)

---

[3]"*FPPC*" refers to *Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 42 ("Given the widespread public debate of initiatives, the explanations in the ballot pamphlets *and in the media*, … it is unreasonable to assume the initiative measures receive less scrutiny than proposed legislation."  (Italics added.))

The majority in *Cordova* has debunked the arguments relied upon in *Esparza* and the majority opinion in this case regarding what the voters must have intended based on legislative history and arguments for and against the passage of Proposition 47. However, until further clarification from our California Supreme Court, I rely, as I must, on the plain meaning rule. (*People v. Leal, supra,* 33 Cal.4th at pp. 1007-1008.)

**II.    Section 1170.18(c) has no application to defendant's resentencing under the Act**

I do concur in the result because there is nothing in Proposition 47 to indicate the definition enacted under section 1170.18(c) is to be applied retroactively to defendant under the Act.

I begin my analysis with section 3 of the Penal Code, which provides that "[n]o part of it is retroactive, unless expressly so declared." "Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent. When the Legislature has not made its intent on the matter clear," section 3 provides the default rule. (*People v. Brown* (2012) 54 Cal.4th 314, 319.) Proposition 47 is silent on the question of whether it applies retroactively to proceedings under the Act. The analysis of Proposition 47 by the legislative analyst and the arguments for and against Proposition 47 are also silent on this question. (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) pp. 34-39.) Because the statute contains no express declaration that section 1170.18(c) applies retroactively to proceedings under the Act, and there is no clearly implied intent of retroactivity in the legislative history, the default rule applies. Defendant cites *In re Estrada* (1965) 63 Cal.2d 740 to argue retroactive application.

In *Estrada*, the court stated:

"When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now

6.

deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*In re Estrada*, *supra*, 63 Cal.2d at p. 745.)

Defendant argues that under the *Estrada* case, unless there is a "savings clause" providing for prospective application, a statute lessening punishment is presumed to apply to all cases not yet reduced to a final judgment on the statute's effective date. (*In re Estrada*, *supra*, 63 Cal.2d at pp. 744-745, 747-748.) However, the *Estrada* case has been revisited by our Supreme Court on several occasions. In *People v. Brown*, *supra*, 54 Cal.4th at page 324, the court stated: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in [Penal Code] section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." "The holding in *Estrada* was founded on the premise that '"[a] legislative mitigation of the penalty *for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law."'" (*Id.* at p. 325.) In *Brown*, the court did not apply the *Estrada* rule because "a statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent." (*People v. Brown*, *supra*, at p. 325.)

Similarly here, *Estrada* does not control because applying the definition of "unreasonable risk to public safety" in Proposition 47 to petitions for resentencing under

7.

the Act does not reduce punishment for a particular crime.**4** Instead, the downward modification of a sentence authorized by the Act is dependent not just on the current offense but on any number of unlimited factors related to the individual offender, including criminal conviction history, disciplinary and rehabilitation records, and "[a]ny other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (g)(3).)

For this reason also, defendant's argument his equal protection rights would be violated if he is denied retroactive application is unavailing. In light of the unlimited factors related to individual offenders that inform the exercise of discretion, no two individual offenders may be said to be similarly situated for purposes of resentencing under the Act. Defendant fails to establish he has been denied equal protection as against any other similarly situated individual.

Because section 1170.18(c)'s definition of "unreasonable risk of danger to public safety" does not apply retroactively to the Act, the sentencing court applied the correct standard in exercising its discretion to not resentence defendant. Since defendant has failed to show an abuse of that discretion, I concur in the majority's affirmance of the judgment.



PEÑA, J.

---

**4**The majority in *People v. Cordova*, *supra*, 248 Cal.App.4th at page 568 acknowledged *Estrada*'s limited applicability, but found in favor of retroactivity for other reasons not urged here by defendant nor briefed by the People. As the retroactivity issue is currently pending, I will wait for guidance from our Supreme Court on this issue.